MARY E. MARTINEZ *et al.*, Plaintiffs and Counterdefendants-Appellants, *v.* RAYMOND F. KNOCHEL *et al.*, Defendants (Curry Ready Mix and Building Supplies, Inc., *et al.*, Defendants and Counterplaintiffs-Appellees; Mary E. Martinez, *et al.*, Counterdefendants; St. Louis Flexicore, Inc., *et al.*, Defendants and Counterdefendants-Appellees).

Fourth District   No. 4—83—0242

Opinion filed April 25, 1984.

Harris & Harris, of Lincoln, for appellants.

Kepner & Giganti, of Springfield, for appellee Chanen's, Inc.

Mohan, Alewelt & Prillaman, of Springfield, for appellees Curry Ready Mix and Building Supplies, Inc. and Curry Ice & Coal, Inc.

Jefferson Lewis and Nolan Lipsky, both of Petersburg, for appellee St. Louis Flexicore, Inc.

JUSTICE MILLER delivered the opinion of the court:

This appeal involves mechanics' liens that were filed against five acres of land outside Lincoln. The four plaintiffs together owned an undivided one-half interest in the land; the owner of the other one-half interest was defendant Raymond Knochel, the plaintiffs' uncle. On September 10, 1979, Knochel agreed to sell the land to defendant Paul Jackson and his company, Sports Systems, Inc., who planned to construct and operate a sports center on the property. In pursuit of that plan Jackson then procured a contractor to construct the envisioned building. Construction went forward in the last several months

of 1979, but the building was never completed. The liens at issue arise from the contractor's agreements with various subcontractors that did work or supplied materials but were not paid.

The plaintiffs sued to cancel the claims against their interests, arguing that they had not authorized or permitted the construction. After hearing testimony, the trial judge found that Knochel had been acting as the plaintiffs' agent and held that the liens were valid against them. The major issue on appeal concerns the scope of Knochel's authority as the plaintiffs' agent. Alternatively, the plaintiffs argue that two of the subcontractors did not perfect their claims, and they also attack the trial court's allowance of various costs. Except for the plaintiffs' objection to the costs, the parties do not dispute the amounts involved here.

The plaintiffs filed their complaint July 3, 1980, seeking to cancel the mechanics' liens that had been filed against their property. The plaintiffs alleged that although they had given Knochel oral approval to sell the five acres for $45,000, they had never signed a contract, had not known about the construction activity until after it was already under way, and had not authorized it. According to the complaint, the contractor had filed a claim against them for $150,000, and this included the claims of 10 subcontractors totaling about $63,000. The plaintiffs later amended the complaint by alleging that they first noticed the construction on the property on October 15, 1979.

Only five of the subcontractors sought to enforce their claims in response to the complaint: Curry Ready Mix, which supplied concrete, Curry Ice & Coal, which supplied and hauled sand and similar materials, Chanen's, which supplied fabricated steel, St. Louis Flexicore, which supplied and installed floor slabs, and Reilly Construction, which pumped concrete. Five other subcontractors did not perfect their claims and were eventually defaulted. Jackson, Sports Systems, Inc., and the general contractor also failed to participate and were eventually defaulted.

After hearing testimony and reviewing the record, the trial judge found that the five active claimants had valid, perfected liens. The court specifically found that Knochel had acted as the plaintiffs' agent and that the plaintiffs and Knochel had permitted the making of the contracts with the lien claimants.

On March 4, 1983, the court entered a proposed decree of foreclosure and sale of the five affected acres. Each of the five successful lien claimants was awarded the amount of its claim, the cost incurred in establishing the claim, and the appropriate amount of interest. Thus, the court ordered the plaintiffs and Knochel to pay Curry

Ready Mix $13,223.13, Curry Ice & Coal $9,043.90, Chanen's $6,758.87, St. Louis Flexicore $14,177.36, and Reilly Construction $2,375.08.

Whether the subcontractors' liens are enforceable against the plaintiffs and their interests in the five acres depends upon the circumstances surrounding the sale of the land to Jackson and his company. Testifying at trial were the four plaintiffs, defendant Knochel, and Daniel Bock, the realtor who handled the sale of the property. The testimony centered on the scope of Knochel's authority and the extent of the plaintiffs' knowledge of what was occurring on their property. Few of the underlying facts are in dispute.

The five acres involved here are part of an 80-acre tract of farmland once owned by George and Katherine Knochel. In 1953 Katherine, then a widow, died, leaving the land to her two children, Raymond Knochel and Catherine Knochel Dehner, as tenants in common. Catherine Dehner died in 1977, leaving her interest in the land to her four children, the plaintiffs, in equal shares as tenants in common.

The plaintiffs had moved away from Lincoln before their mother's death. Plaintiff James Dehner testified that the land was for sale even before Catherine Dehner died. The property was listed with Bock, the realtor, who had signs on the property advertising it for sale in 1979. James Dehner also said that Raymond Knochel had the children's oral approval to try to find a buyer; Knochel generally handled all matters concerning the property, including the payment of taxes and the collection of crop rentals. Dehner testified that he and his sisters wanted the five acres cleared of trees and brush before it was sold—it was not tillable—but that they never agreed for construction to proceed before the sale was final. Dehner knew in September 1979 that a potential buyer had been found, and a month later he learned that construction was going ahead on the land. On October 27, 1979, he and his sisters met with attorney John Gehlbach to discuss their mother's estate, which Gelbach was handling; Gehlbach was their uncle's lawyer also. At this meeting the plaintiffs demanded that the construction cease. Early in 1980 Dehner began receiving 90-day notices of liens from various subcontractors.

Plaintiff Kathy Killion testified that in September 1979 Bock told her that the five-acre parcel had been sold to Jackson and that a sports center was going to be built there. Killion visited Lincoln October 5, 1979, to meet with Gehlbach about her mother's estate; Killion and her brother were co-executors. During that visit Gehlbach took her to the construction site, and later that day she met Jackson, the

buyer. Killion communicated with her siblings that day, telling them about the construction. Killion acknowledged that she did not demand a halt to the construction until later that month, at the meeting on October 27. Killion also testified that Raymond Knochel had received her oral approval to try to find a buyer for the land and that the land had been advertised for sale since before 1977.

Plaintiff Cynthia Stephens testified that she, her siblings, and Knochel attended two funerals of relatives in Lincoln in August 1979 and on both occasions discussed, in general terms, the sale of the land.

Plaintiff Mary Martinez repeated much of her siblings' testimony. She had known that the land was for sale and that Knochel and Bock were trying to find a buyer for it.

Defendant Raymond Knochel testified that he managed the farm that includes the five acres at issue here. He had been seeking a buyer for the five acres since 1975, when he and Catherine, his sister, decided to try to sell it. He believed that he had the plaintiffs' authority to sell the land, and he had discussed that subject with them before signing the contract with Jackson.

Daniel Bock, the realtor handling the sale, testified. According to Bock, beginning in 1975 Knochel entered into several successive listing agreements with him, and in each one Knochel was identified as the owner or authorized agent. Bock testified that he met with Paul Jackson in August 1979 to discuss the land and that in September Jackson made an offer. The contract was signed September 10, 1979, for a purchase price of $45,000 for the five acres. Soon after that Bock learned of the plaintiffs' interests in the land—he had always assumed that Knochel was the sole owner. On September 18, 1979, Bock wrote to plaintiffs Dehner and Killion, as co-executors of their mother's estate, telling them the news of the sale.

Bock testified that although various matters were delaying the closing of the sale, Jackson wanted to proceed with construction of his sports building. In later September Knochel gave his permission for a foundation to be laid if Jackson made another payment toward the purchase price. That was done in the middle of October; by that time Jackson had paid $7,000.

Section 1 of the Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 1) delimits the class that may pursue claims of liens:

> "Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or

tract of land, furnish material *** ."

The subcontractor's lien, arising under section 21 of the Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 21), depends on the existence of a contract between the owner and the contractor. (*B & C Electric, Inc. v. Pullman Bank & Trust Co.* (1981), 96 Ill. App. 3d 321, 421 N.E.2d 206.) The plaintiffs argue that they did not knowingly permit or authorize Jackson, the buyer, to contract for the improvements and that Knochel lacked the authority to bind them to any agreement with Jackson.

The subcontractors argue that the plaintiffs were served and bound by three agents—Knochel, Bock, and Gehlbach. The plaintiffs knew that Knochel handled the farm's affairs and had given him their permission to sell it. They also knew that the land was listed for sale with Bock. Finally, Gehlbach was the attorney for their mother's estate as well as for their grandmother's estate. Although the precise scope of each of these agents' authority is not clear, Knochel's longstanding management of the land and his general authority to contract for its sale were sufficient for him to bind the plaintiffs in the agreement of September 10, 1979, and the later discussions on beginning the project before the sale was closed.

In deciding to enforce the liens against the plaintiffs the trial judge relied on *Wanzer v. Smorgas-Brickan Developers, Inc.* (1970), 130 Ill. App. 2d 378, 264 N.E.2d 435. In that case the buyers entered a building under an agreement for deed and began to have improvements made to it; the buyers later went bankrupt without having paid their materialmen, who then filed liens against the property. The court enforced the liens, holding that the sellers' agent, who was their real estate agent and manager, realized that the improvements would be made and that that knowledge could be imputed to the owner-sellers. A similar result was reached in *Mutual Construction Co. v. Baker* (1925), 237 Ill. App. 596, where the owner's son managed the property and knew that the improvements were being made. His knowledge was imputed to his mother.

■ We agree with the trial judge that the plaintiffs were bound by their uncle's acts and therefore the subcontractors could pursue claims of liens against them.

The plaintiffs argue next that the lien of St. Louis Flexicore is unenforceable because that company did not file its counterclaim until more than two years after its final delivery of material. Section 9 of the Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 9) contains the two-year requirement and says in part:

"Such suit shall be commenced or counterclaim filed within two

years after the completion of the contract, or completion of the extra or additional work, or furnishing of extra or additional material thereunder."

Section 28 of the Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 28) makes this time limit applicable to subcontractors' claims. For St. Louis Flexicore the two-year period began running November 19, 1979, the date of its last delivery to the construction site in Lincoln. The company filed an answer to the plaintiffs' complaint on July 25, 1980, and filed its counterclaim September 24, 1982, several days before trial. The trial judge ruled that the counterclaim was an amendment to the timely answer and therefore was within the period allowed by section 9.

Section 12 of the Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 12) provides in part:

"The court shall permit amendments to any part of the pleadings, and may issue process, make all orders, requiring parties to appear, and requiring notice to be given, that are or may be authorized in other civil actions and shall have the same power and jurisdiction of the parties and subject matter, and the rules of practice and proceedings in such cases shall be the same as in other civil cases, except as is otherwise provided in this act."

We see nothing in the Mechanics' Liens Act that would prohibit application of section 2—616 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—616), on amendments to pleadings.

In allowing the counterclaim as an amendment, the trial judge relied on this court's opinion in *C.S. Lewis, Inc. v. Cabot Corp.* (1980), 85 Ill. App. 3d 708, 407 N.E.2d 84. In that case, a suit to foreclose a mechanic's lien, the subcontractor entered its appearance within the two-year time limit but did not file an answer or counterclaim until after the two years were up. The subcontractor argued that his claim was timely because it related back to when the appearance was entered; the subcontractor relied on section 46(2) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 46(2)), now section 2—616(b) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—616(b)), which provides that a claim asserted in an amended pleading is not barred by any time limit if it apparently arose from the same transaction set forth in the party's original, timely pleading. The court said that even if the entry of appearance was considered a pleading within the meaning of the statute, the subcontractor's did not set forth a transaction, and therefore did not come within the scope of the statute on amendments. *C.S. Lewis* distinguished *Douglas Lumber Co. v. Chicago Home* (1942), 380 Ill. 87, 43 N.E.2d

535, a subcontractor's action to foreclose a mechanic's lien. The subcontractor there was allowed to amend his complaint to seek recovery for material—lumber—that had been omitted from the earlier pleading. The court in *Douglas Lumber* said:

> "Defendants further contend such amendment introduced a new item of material into the case for the first time and that it was barred by the time limitation of the Lien act. Section 46 permits an amendment at any time before judgment with respect to any matter either of form or substance which may enable the plaintiff to sustain the claim intended to be brought. It further provides that the cause of action shall not be barred by lapse of time under any statute prescribing or limiting the time for suit, if the original pleading was filed in apt time and if the cause of action asserted in the amendment grew out of the same transaction or occurrence originally set forth. The amendment relates back to the date of the filing of the original pleading. It is clear the facts in this case are within the provision of the statute. The contention is without merit." 380 Ill. 87, 98-99, 43 N.E.2d 535, 540.

The pleadings of St. Louis Flexicore came within the rule in *Douglas Lumber*. In its answer to the plaintiffs' complaint, St. Louis Flexicore admitted filing a claim for $12,200, the amount specified in the complaint. The answer and the counterclaim are sufficiently specific to support the conclusion that they refer to the same transaction.

A different result was reached in *Well Done Heating & Sheet Metal Co. v. Ralph Schwartz & Associates* (1983), 112 Ill. App. 3d 438, 445 N.E.2d 451. There the lien claimant, a contractor, sought to file an otherwise untimely cross-complaint against the owner of the property after the plaintiff, a subcontractor, settled his claim and the action was dismissed with prejudice. The court rejected the contractor's argument that his cross-complaint qualified as an amendment to his earlier answer. First, this would have required a major realignment of the parties, for both the contractor and the property owner were named as defendants in the original action by the subcontractor. Second, after the two-year time limit has passed, a new defendant cannot be added in an action to foreclose a mechanic's lien, nor can a cross-claim be brought against a codefendant.

■ The objections expressed in *Well Done Heating* to allowing the amendment do not obtain here. The plaintiffs brought this action to cancel the various liens that had been filed against their property, and it would be inequitable to prevent St. Louis Flexicore from asserting its claim. The provision on amendments that is contained in

the Code of Civil Procedure may be applied here (*Douglas Lumber*), and we are satisfied that the amendment was properly allowed.

The plaintiffs also argue that St. Louis Flexicore and Reilly Construction failed to perfect their liens because they did not comply with the requirements in section 24 of the Mechanics' Lien Act (Ill. Rev. Stat. 1981, ch. 82, par. 24) that the owners be served with notice of the claims within 90 days of completion of work by the subcontractor. The plaintiffs did not raise this objection until their post-trial motion, however, and we conclude that it has been waived.

Finally, the plaintiffs object to $90.50 in costs that the trial court assessed against them; they do not question the assessment of $376.55 for various deposition fees and charges. The amount objected to comprises money spent for recording lien claims, recording a *lis pendens* notice, sheriff's service of 90-day notices, and transcription by a court reporter. Whether to tax these items as costs was within the trial court's discretion, and we see no reason to disturb that decision.

Affirmed.

MILLS, P.J., and WEBBER, J., concur.