B. KREISMAN & CO., Plaintiff-Appellee and Cross-Appellant, *v.* FIRST
ARLINGTON NATIONAL BANK OF ARLINGTON HEIGHTS, Trustee, *et al.*,
Defendants-Appellants and Cross-Appellees.

Second District    No. 79-437

Opinion filed December 22, 1980.—Rehearing denied January 20, 1981.

John Demling, of Law Offices of John Demling, of Glen Ellyn, for appellants.

Alan L. Stefaniak and Eugene A. DiMonte, both of DiMonte, Baker & Lizak, of Chicago, for appellee.

Mr. JUSTICE NASH delivered the opinion of the court:

Defendants, Ruth Mayer and First Arlington National Bank, as trustee, appeal from a judgment imposing a mechanic's lien against real estate in Du Page County upon which the Le Grand Chalet restaurant, operated by Grand Chalet, Inc., was located. Plaintiff, B. Kreisman & Co., cross-appeals from the denial of a personal judgment against Ruth Mayer for the balance due for equipment installed by Kreisman in the restaurant.

The evidence discloses that the Grand Chalet, Inc., was incorporated in 1972 for the purpose of operating a restaurant. Mayer became its secretary-treasurer, and Christopher Demos became its president, with each owning one-half of the corporate stock. Demos made no initial financial contribution to the corporation, bringing into it his experience in the restaurant business which Mayer lacked. Since Demos never paid for his stock, his interest in the corporation was later severed in December 1973 and Mayer's son then became president. It is not clear from the record whether Mayer or her son received Demos' share of the stock because she failed to comply with a request to produce the stock registry at trial. Title to the land upon which the restaurant was to be situated was held by the First Arlington National Bank, as trustee, under a land trust of which Mayer was principle beneficiary. Later in 1972 Mayer commenced the remodeling of an existing building on the property and the construction of an addition to it. Mayer and Demos also began discussions with Bernard Kreisman, president of B. Kreisman & Co., for the purchase of kitchen equipment to be used in operating the restaurant. Thereafter, on May 13, 1973, Kreisman and Mayer entered into an oral contract (it is disputed whether Mayer was acting in her own behalf or for the corporation in doing so) under which Kreisman agreed to supply and install designated restaurant equipment for a price of $208,249.43, and Kreisman completed his portion of the contract by December 24, 1973.

The remodeling of the building and purchase of the restaurant equipment was financed by an $800,000 loan made in March 1973 by the First Arlington National Bank and was secured by a trust deed on the real estate executed by the bank in its capacity as trustee of the property. $760,000 of these funds were deposited with Chicago Title and Trust

Company under an escrow agreement entered into with it by Mayer on behalf of the trustee. As the equipment was delivered and installed by Kreisman it provided lien waivers and contractor's affidavits and, after approval by Mayer, received disbursements from the escrow account.

By June 3, 1974, Kreisman had received only $128,077.25 of the contract price and it commenced this action. In May 1975, before this cause had proceeded to trial, Grand Chalet, Inc., filed a chapter 11 proceeding in bankruptcy. Kreisman participated in those proceedings and approved a plan of arrangement under which it ultimately received a dividend of $22,612.59 which Kreisman credited towards payment for restaurant equipment other than that for which it seeks recovery in this action.

The trial court determined that the real estate was subject to a mechanic's lien for the improvements made by the kitchen equipment furnished by plaintiff in the sum of $31,922.98. It further found that the subject premises were not the property of Grand Chalet, Inc. and that Kreisman's acceptance of the plan of arrangement in the bankruptcy proceeding released only the corporation from further claims and not the present defendants. The trial court also determined that Ruth Mayer was acting in her capacity as an officer of the corporation when the contract with Kreisman was made and that the evidence was insufficient to warrant piercing of the corporate veil so as to impose personal liability upon her.

In their appeal, defendants Mayer and the trustee contend that the trial court erred in finding the restaurant equipment to be lienable and, alternately, that Kreisman is estopped from asserting a mechanic's lien as it received payments under the contract exceeding the sums due for any lienable equipment it supplied and that the payments made should have been first applied to those items by Kreisman.

In its cross-appeal, Kreisman contends that its contract was with Mayer personally and not with Grand Chalet, Inc., and, alternately, that the corporate veil ought to be pierced to permit a personal judgment against Mayer for the sums due under the contract.

I.

We will first consider Kreisman's cross appeal where it asserts that the corporate veil of Grand Chalet, Inc., should be pierced and personal liability imposed upon Ruth Mayer.

While it is the general rule that a corporation is an entity separate and apart from its shareholders (*e.g., Loy v. Booth* (1974), 16 Ill. App. 3d 1077, 307 N.E.2d 414), this is a legal theory used for the convenience of the business world which will not be permitted to be extended "to a point beyond its reason and policy, and when invoked in support of an end

subversive of this policy, will be disregarded by the courts." (*Wikelund Wholesale Co. v. Tile World Factory Tile Warehouse* (1978), 57 Ill. App. 3d 269, 273, 372 N.E.2d 1022, 1024.) The privilege of conducting one's business affairs through the separate legal entity of a corporation will be disregarded in those exceptional circumstances where to adhere to the fiction would sanction a fraud or promote injustice. (*People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29, 277 N.E.2d 844, 851; *Gowdy v. Richter* (1974), 20 Ill. App. 3d 514, 314 N.E.2d 549.) Whether the corporate veil will be pierced depends upon the circumstances of each case. (See, *e.g., Stap v. Chicago Aces Tennis Team* (1978), 63 Ill. App. 3d 23, 27-28, 379 N.E.2d 1298, 1302.) The ultimate inquiry for appliation of the doctrine has been said to be whether or not there is "(1) * * * such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." (63 Ill. App. 3d 23, 27, 379 N.E.2d 1298, 1301.) Consideration may also be given to whether the corporation is the alter ego of a dominant personality and whether the principle shareholder treats the corporation as if it were his sole property in disregard of its corporate status. *Wikelund Wholesale Co.*

In our view the determination by the trial court that the doctrine may not be applied in this case was contrary to the manifest weight of the evidence. It is apparent that Ruth Mayer was the dominant force controlling the transaction with Kreisman and the restaurant construction. She was the principle beneficiary of the trust holding legal title to the restaurant property which the trustee furnished as security for the construction loan from which the improvements and equipment costs were to have been paid. She also entered into the escrow agreement on behalf of the trustee under which all disbursements of funds required her approval. We find it noteworthy, too, that in her initial answer filed in this action on June 28, 1974, Mayer described herself as "Ruth Mayer, individually, and doing business as Le Grand Chalet" in admitting she had entered into the contract with Kreisman. Although subsequently withdrawn, this document can be considered as an evidentiary admission on her part. *Kleb v. Wendling* (1978), 67 Ill. App. 3d 1016, 385 N.E.2d 346.

Further indication of Ruth Mayer's disregard of the separate corporate entity is shown by the timing of the filing of various pleadings in relation to the bankruptcy of the corporation. Her initial answer in this case was filed 11 months before the corporation went into bankruptcy, at a time when there was no reason to insist that the contract bound only the corporation, and was not withdrawn until after any corporate obligation under the contract was discharged. Again, in September 1976, some six months after conclusion of the corporate bankruptcy proceed-

ings in March 1976, Mayer filed a counterclaim and third-party action against other parties not concerned with this appeal. There, too, she described herself as Ruth Mayer, individually and d/b/a Le Grand Chalet, and sought personal damages for incomplete and defective work in the construction delays and for injury to her business reputation. That action was pending at the time of the trial of the present case. It is obvious that she would not be personally entitled to damages for such injuries if the corporation, in fact, owned the restaurant. It therefore appears that the entity of the corporation was relied upon by her only when it was to her advantage. We note, too, that while the equipment was never fully paid for, the restaurant had the use of it until 1975, when the corporation was sold and the equipment continued to be used by the new owner.

■■ Under these circumstances we believe the corporate veil should be pierced to require Mayer to be personally liable; to say otherwise would promote an injustice and permit her to be unjustly enriched at plaintiff's expense. See *State Bank v. Benton* (1974), 22 Ill. App. 3d 1007, 317 N.E.2d 578; *Loy v. Booth* (1974), 16 Ill. App. 3d 1077, 307 N.E.2d 414.

Although plaintiff also sought to impose personal liability on Ruth Mayer on the grounds that the contract was between her personally and plaintiff, we need not reach that issue in view of our determination that the corporate veil of Grand Chalet, Inc., should be pierced.

## II.

We next consider defendants' appeal wherein they contend first that the restaurant equipment installed on the premises by Kreisman were trade fixtures and, therefore, not lienable.

The trial court imposed a lien against the real estate for certain equipment it found had been incorporated in the premises and constituted a permanent and valuable improvement thereof. These were described in plaintiff's exhibit No. 6, which listed 27 items of kitchen equipment and included an 8-foot waitress station, ice-making machines, ovens, broilers, fryers, steamers, refrigerators, walk-in coolers, a 60-gallon soup kettle, 60-quart mixer, 7-foot service station, beverage stand and a dishwashing complex consisting of a soiled dish table, conveyors and an industrial type dishwasher. Most of this equipment was heavy, and some items were connected to the building by some combination of gas, electric, water or drain lines. Some of it was also connected to the walls or floor by a chemical sealant which was required by local health regulations. There was a series of double stacked ovens which were on castors, and also connected to the building by utility lines. Other equipment such as the stoves, fryers and steamers were bolted together in line under the hoods of the kitchen exhaust system, sealed to the walls and connected to the utilities.

Evidence was presented that the sealant could be broken without

damage to the building and that although the substantial size and weight of some of the equipment would require it to be dismantled, most could be removed without damage to the building. The trial court found that each of the items listed in exhibit No. 6 had become an integral part of the restaurant building and was lienable.

There are essentially three factors to be considered to determine whether an article installed in a building is lienable or will be considered as a trade fixture not subject to a mechanic's lien: First, the means by which it has been annexed to the real estate. Second, whether it is adapted to and necessary for the purpose to which the premises is devoted. Third, whether the parties (those having an interest in the improved premises such as an owner or lessee) intended that the articles become a part of the realty. (*Miller v. Reed* (1973), 13 Ill. App. 3d 1074, 302 N.E.2d 131.) Preeminent among these factors has been the intent of the parties; the other factors find their primary utility as evidence of that intent. (*Owings v. Estes* (1912), 256 Ill. 553, 100 N.E. 205; *Daly v. Ling* (1928), 248 Ill. App. 104; *Wanzer v. Smorgas-Brickan Developers, Inc.* (1970), 130 Ill. App. 2d 378, 264 N.E.2d 435.) The relationship between the parties is often determinative of intent, as it is more probable that an owner intends to make an improvement a permanent part of his own realty (*Owings v. Estes*; *Dual Temp Installations, Inc. v. Chicago Title & Trust Co.* (1976), 41 Ill. App. 3d 415, 354 N.E.2d 131), or that a lessee intends to do so when he improves the premises where the lease provides all improvements are to remain on the premises at its expiration for the benefit of the lessor. *R. Haas Electric & Manufacturing Co. v. Springfield Amusement Park Co.* (1908), 236 Ill. 452, 86 N.E. 248; see generally Annot., 52 A.L.R. 2d 222 (1957).

In considering these factors as applied to the present case, it is seen that the restaurant equipment, other than the walk-in coolers, are primarily attached to the real estate by utility lines and the chemical sealant. While the equipment was large and heavy, it could be removed from the building without injury to either it or the building. We consider the first factor to be of minimal value in determining whether Mayer (or the restaurant corporation) intended to permanently improve the property. It is apparent, however, in considering the second factor, that the equipment was for use in the restaurant business to be carried on in the premises and that the existing building was remodeled and an addition added directed to that purpose. Mayer agreed the equipment in issue was essential to the operation of the restaurant and testified that when the business was subsequently sold it continued to be so used by the new owner.

■■ In considering the third factor, we note that it is the intent to permanently improve the real estate, not simply the intent to use the equipment in the business carried on in it, which is relevant to the

question of lienability. In *Dual Temp Installations, Inc. v. Chicago Title & Trust Co.* (1976), 41 Ill. App. 3d 415, 354 N.E.2d 131, a case strikingly similar to the present case, food processing equipment was installed in a building converted for that use. The corporation which ordered the equipment had been organized by the person who was the beneficiary of the land trust holding title to the property, and the building was adapted for use of the equipment in the food processing business to be carried out in it and the equipment was essential to that purpose. There, too, the court determined that the corporation was the alter ego of the trust beneficiary and noted that the equipment was subsequently used by the new owner when the business was sold. The court concluded in *Dual Temp* that the beneficial owner of the premises intended, in these circumstances, to permanently improve the real estate and that the equipment was installed in a manner making it an integral part of it. The court reasoned:

> " 'If machinery is intended for permanent use in carrying on the business for which the building was erected or is used, and as a permanent accession to the realty, it becomes a part of the realty on being installed thereon, and if such was the intention, it is immaterial that the machines may be removed and used elsewhere, and that they may be removed without injury to the building. This rule has special application to heavy machinery intended for the building and not intended to be moved from place to place though resting in position by its own weight, and to machinery which is a constituent part of a factory or shop and indispensible thereto, though not actually fastened.' " 41 Ill. App. 3d 415, 418, 354 N.E.2d 131, 133.

■■ In the present case we conclude that Mayer intended to permanently improve the real estate by the installation of certain of the equipment in question: the walk-in coolers, which were built into the structure of the building; the stoves, ovens, fryers and steamers, shown in defendants' exhibit No. 36, which are connected together and sealed to the building wall under an exhaust system which is attached to the ceiling; the three large ranges shown in defendants' exhibit No. 50, which are fastened together and to the wall; and the soiled dish table and dishwasher complex shown in defendants' exhibit No. 48, which were, in part, custom made for this installation. Each of these items were also connected to the service lines of the building. We consider these articles to be a constituent part of the restaurant building, indispensible to the business for which the building was adapted and intended to be a permanent improvement to it. Compare *Porch v. Agnew Co.* (1905), 70 N.J. Eq. 328, 61 A. 721, *aff'd* (1907), 71 N.J. Eq. 305, 65 A. 485 (large vegetable kettles in a hotel which were connected by steam and waste pipes held subject to a mechanic's lien) and *Union Stove Works v. Klingman* (1897), 20 App. Div. 449, 46

N.Y.S. 721, *aff'd* (1900), 164 N.Y. 589, 58 N.E. 1093 (ranges and other equipment held subject to mechanic's lien), with *Ward v. Town Tavern* (1951), 191 Ore. 1, 228 P.2d 216 (coffee urns, steam chests, soda fountain and a stove hood installed by a tenant in a restaurant held not lienable); see generally Annot., 52 A.L.R.2d 222 (1957) (appliances, accessories, pipes or other articles connected with plumbing as fixtures); Annot., 57 A.L.R.2d 1103 (1958) (electric ranges as fixtures).

The other articles of equipment for which the trial court imposed a lien retain their character as trade fixtures and are not lienable. Most are free standing, being simply in the building and not in any substantial way a part of it. Accordingly, the judgment of the trial court will be reversed in part, and on remand it will determine the amount due for those items of kitchen equipment which we have found to be lienable.

### III.

Defendants next contend Kreisman is estopped from asserting a mechanic's lien as it received total payments under its contract which exceeded the sums due for lienable equipment to which such payments should have been first applied.

■■■ Where a debtor has several accounts with a creditor the general rule is that a payment made by him without direction to a specific account may be applied by the creditor to any account he chooses and he need not apply it to an account for which he might claim a lien. (*Illinois Refinery Co. v. Welch* (1930), 341 Ill. 292, 173 N.E. 345.) This rule has been described as the doctrine of equitable application of payments and it is not inflexible. While considerations of equity will sometimes warrant application of payments made without direction to secured accounts (*Compound Lumber Co. v. Murphy* (1897), 169 Ill. 343, 48 N.E. 472; *Schwulst Gerling Co. v. Frost* (1933), 269 Ill. App. 213), usually the equities on the side of the lienor will prevail and payments applied to extinguish nonlienable claims will be sustained. (*Bingaman v. Dahm* (1940), 307 Ill. App. 432, 30 N.E.2d 509; *Young v. Bergner* (1927), 243 Ill. App. 473; *Loeff v. Meyer* (1918), 209 Ill. App. 382.) The rationale of these cases is that it would be against public policy to force the creditor to apply payments to secured accounts and thereby deprive him of his right to a lien. In a similar context, it has been held that "in cases of ambiguity the doubt should be resolved against the waiver, [of the lien] since it should be presumed, in the absence of clear evidence to the contrary, that one has not disabled himself from the use of so valuable a privilege as that given by statute for the enforcement of builder's rights * * * ." (*Burgoyne v. Pyle* (1931), 261 Ill. App. 356, 369.) In our view, there are no considerations of equity in the present case which would require us to depart from the general rule.

Defendants also contend that the construction loan escrow account was in the nature of a surety bond for the discharge of claims for labor, material and equipment which might become a lien. They rely on language in *Village of Winfield v. Reliance Insurance Co.* (1965), 64 Ill. App. 2d 253, 212 N.E.2d 10, as permitting departure from the general rule regarding application of payments where a surety is involved. We find this argument to be without merit and decline to extend *Village of Winfield* to the facts of this case.

■■ Defendants suggest further that the lien waivers and contractor's affidavits which Kreisman provided in order to obtain payments, when read together with the checks and the invoices to which they were applied, establish that payment was in fact made for the items for which a lien is now sought. We do not agree. From a careful examination of the record it is apparent that the funds Kreisman received from the construction escrow account were either applied towards items of equipment for which it is not asserting a lien or, if applied towards items for which it now claims a lien, due credit was given for the sums so applied.

For the foregoing reasons the judgment of the trial court is reversed insofar as it declined to impose personal liability upon Ruth Mayer and it is affirmed, as modified, insofar as it imposed a lien for certain kitchen equipment installed in the building. The cause will be remanded for further proceedings not inconsistent with this opinion.

Reversed in part; affirmed in part; and remanded.

VAN DEUSEN and WOODWARD, JJ., concur.